UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

DAVID F. CASS, SR.,

PLAINTIFF

v.

AIRGAS USA, LLC,

DEFENDANT.

Case No. 1:17-cv-00313-JD

**STATEMENT OF MATERIAL FACTS IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56, defendant Airgas USA, LLC ("Defendant") submits the following Statement of Material Facts in support of its Motion for Summary Judgment.

1. Airgas supplies gases, and related equipment and supplies, to customers in a host of industries. (Affidavit of Patty Wachel ("Wachel Aff.) ¶ 3; Affidavit of Dana Leith ("Leith Aff.") ¶ 3).

2. David Cass worked at Airgas's facility in Salem as a Specialty Air Gas Filler Analyst. (Wachel Aff. ¶ 5; Deposition of David F. Cass, Sr. ("Cass Dep.") at p. 23).[1]

3. As a Specialty Air Gas Filler Analyst, Cass was responsible for analyzing special gases, liquids, and carbon dioxide to make sure they satisfied industry standards. (Cass Dep. at pp. 23-24, Ex. 3).

4. Many of these gases are noxious; and improper handling or release of these gases would pose a serious safety hazard. (Wachel Aff. ¶ 9; Leith Aff. ¶ 7; Cass Dep. at p. 30).

[1] The transcript of the deposition of David Cass is attached as Exhibit A to the Affidavit of Christopher B. Kaczmarek submitted herewith.

5. In order for Cass to analyze these gases, the metal cylinders in which they are stored must be transported by forklift to and from the laboratory where Cass worked. (Cass Dep. at pp. 26-28).

6. Cass worked on the second shift, which runs from approximately 2:00 p.m. to 11:00 p.m. (Wachel Aff. ¶ 5; Cass. Dep. at pp. 19-20).

7. On July 21, 2014, a supervisor observed Cass sleeping at his desk in the laboratory. (Wachel Aff. ¶ 6; Leith Aff. ¶ 5; Cass Dep. at pp. 40-42).

8. Upon learning of this situation, the plant's Safety Program Manager, Dana Leith, conferred with Patty Wachel, the human resources representative assigned to the Salem facility, and Wachel's supervisor, Matt Kachur. (Wachel Aff. ¶¶ 6-8; Leith Aff. ¶¶ 6-7).

9. Given the safety-sensitive nature of Cass's position, they were concerned about the possibility of Cass falling asleep at work again or trying to perform his work duties while drowsy or sleep deprived. (Wachel Aff. ¶¶ 7-10; Leith Aff. ¶¶ 6-8).

10. If Cass was drowsy and failed to correctly evaluate the quality of a specific gas, it could end up being used by a patient, with the potential for adverse health consequences to the patient. (Wachel Aff. ¶ 9; Leith Aff. ¶ 7; Cass Dep. at p. 131).

11. In light of these safety concerns, Leith, Wachel, and Kachur decided that it made sense for Cass to undergo a fitness-for-duty examination. (Wachel Aff. ¶ 10; Leith Aff. ¶ 8).

12. Jason Lattig, the Plant Manager, subsequently met with Cass. (Wachel Aff. ¶ 10; Cass Dep. at pp. 53-54).

13. During this meeting, Cass – who had been diagnosed with sleep apnea over a year before – told Lattig that he was feeling fatigued. (Cass Dep. at p. 55, Ex. 4, 7).

14. Lattig expressed concern for Cass and asked him what could be done to alleviate his fatigue. (Cass Dep. at pp. 55-56).

15. Cass told Lattig that, although his doctor had recommended that he use a CPAP machine while sleeping, he was not using it as frequently as recommended by his doctor. (Cass Dep. at pp. 55-56).

16. Lattig told Cass he needed to undergo a fitness-for-duty examination. (Cass Dep. at p. 53; Wachel Aff. ¶ 10).

17. Cass agreed to go for the examination. (Cass Dep. at pp. 56-57).

18. If Cass fell asleep at work, "it would interfere with the essential functions of [his] job." (Cass Dep. at p. 46, Exh. 4 (response to Interrogatory No. 9)).

19. On July 23, 2014, Cass was evaluated by a doctor who recommended that Cass be re-evaluated in four to six weeks after Cass saw a specialist who could provide a report showing how frequently Cass had been using his CPAP machine. (Cass Dep. at pp. 58-61, Ex. 5).

20. Cass's primary care physician stated that if Cass's sleep apnea was not adequately treated, he "would have concerns about daytime fatigue and his safe operation of a forklift." (Cass Dep. at pp. 63-66, Ex. 6).

21. While Cass was in the process of being evaluated for his fitness for duty, Airgas arranged for other second-shift employees to operate the forklift for him. (Cass Dep. at pp. 62-63; Wachel Aff. ¶ 29; Leith Aff. ¶ 22).

22. On September 30, 2014, Cass was evaluated by Dr. George Neal of the New England Sleep Center at Catholic Medical Center. (Cass Dep. at pp. 67-68, Exh. 7).

23. After analyzing the data from Cass's CPAP machine, Dr. Neal – who had evaluated Cass's sleep apnea back in 2013 – made a number of findings, including the following:

(1) Cass had only used his CPAP machine for 65 of the preceding 365 days; and (2) when he was using his CPAP machine, Cass was only using it for 30 minutes per night on average. (Cass Dep. at pp. 69-70, Exh. 7).

24. CPAP machines contain a chip that measures usage. (Cass Dep. at pp. 75; Wachel Aff. ¶ 18).

25. Cass removed the chip from the machine and provided it to Dr. Neal, who then was able to measure the extent to which Cass had used his CPAP machine. (Cass Dep. at p. 75).

26. Cass – who was only getting four or five hours of sleep per night at the time – told Dr. Neal that he felt "drowsy in the daytime and can be drowsy driving." (Cass Dep. at pp. 69-70, Exh. 7).

27. Dr. Neal advised Cass to increase his usage of the CPAP machine and suggested that he return for a re-evaluation in four to six weeks. (Cass Dep. at p. 70, Exh. 7).

28. On October 3, 2014, Cass underwent a fitness for duty examination at Concentra Medical Centers, Airgas' third-party medical provider. (Cass Dep. at pp. 71-72; Exh. 8; Wachel Aff. ¶¶ 11-12; Leith Aff. ¶¶ 9-10).

29. After reviewing Dr. Neal's report, the doctor who performed the examination concluded that Cass was unable to perform the essential functions of his job because of the risks posed by Cass's unaddressed sleep apnea. (Cass Dep. at pp. 70-73, Exh. 8; Wachel Aff. ¶ 12; Leith Aff. ¶ 10).

30. Consistent with Dr. Neal's report, the doctor believed that the effects of Cass's sleep apnea could be ameliorated by regular use of the CPAP machine. (Cass Dep. at pp. 73-74, Exh. 8; Leith Aff. ¶ 10).

31. Concentra scheduled Cass for a follow-up appointment in 30 days to see whether he could provide a report indicating sufficient CPAP usage. (Cass Dep., Exh. 8; Leith Aff. ¶ 10).

32. Airgas then placed Cass on a paid leave of absence from October 3, 2014 to November 6, 2014. (Wachel Aff. ¶ 13; Cass Dep. at pp. 74-76, Exh. 9; Leith Aff. ¶ 11).

33. The purpose of that leave was to provide Cass with time to increase his CPAP usage so he would be able to return to work. (Wachel Aff. ¶ 13; Leith Aff. ¶ 11).

34. On November 3rd, Cass saw Dr. Jerome Lang of Concentra for a follow-up examination. (Cass Dep. at pp. 80-81, Exh. 11).

35. At that time, Cass's CPAP records showed that he still was not using his CPAP machine consistently; his usage report showed only "43% usage for greater than 4 hours." (Cass Dep. at pp. 80-82, Exh. 11; Leith Aff. ¶ 13).

36. Dr. Lang advised Cass that he would be permitted to return to work if he came back the following week with a CPAP report showing "70% usage of 4 plus hours of use at night." (Cass Dep. at pp. 82-83, Exh. 11).

37. On November 7th, Cass returned to Concentra for the follow-up visit to determine whether he was fit for duty. (Cass Dep. at pp. 83-84, Exh. 12).

38. At the time, Cass's CPAP records showed that he had used his CPAP machine for 70% of the time during the preceding week. (Cass Dep. at pp. 83-84, Exh. 12).

39. Cass also reported "some improvement in his alertness with use of his CPAP machine." (Cass Dep., Exh. 12).

40. Concentra cleared Cass to return to work for one month, with another follow-up appointment scheduled for December 5th. (Cass Dep., Exh 12; Wachel Aff. ¶ 15; Leith Aff. ¶ 12).

41. He then reported to work and performed all of his normal job duties. (Wachel Aff. ¶ 15; Cass Dep. at p. 85; Leith Aff. ¶ 12).

42. At his next appointment, on December 5th, Cass's records showed "[g]ood CPAP compliance for 2 consecutive months" and, therefore, Cass was cleared to continue working. (Cass Dep. at pp. 85-86, Ex. 13).

43. Concentra's report stated that Cass's CPAP results would be monitored for an additional four months. (Cass Dep., Exh. 13; Wachel Aff. ¶ 17; Leith Aff. ¶ 14).

44. On December 9, 2015, Leith sent Cass a letter advising Cass that he should continue to submit CPAP readings to Concentra for the next four months. (Wachel Aff. ¶ 17; (Cass Dep. at p. 88, Exh. 14; Leith Aff. ¶ 14).

45. Wachel, Kachur, and Leith were concerned about the possibility that Cass might discontinue using his CPAP machine on a regular basis. (Wachel Aff. ¶¶ 19-20; Leith Aff. ¶¶ 14-16).

46. To ensure that Cass continued to use his CPAP machine, and remain awake and alert at work, they decided that Cass should continue to provide Concentra with reports of his CPAP usage for six months. (Wachel Aff. ¶ 20; Leith Aff. ¶ 16).

47. On January 14th, Leith sent Cass a letter confirming that he remained cleared to perform his job duties and that "[t]o ensure [his] continued safety, Airgas will require [him] to submit the results from [his] CPAP machine to Concentra Medical Center, periodically within the next 6 months to ensure compliance." (Leith Aff. ¶ 17; Cass Dep., Exh. 16).

48. After Cass returned from his leave of absence, Concentra cleared him to return to work with "no medical restrictions." (Cass. Exh. 12, 13).

49. After Cass (and Cass's wife) expressed some concern about Leith's letter of January 14th, Wachel scheduled a meeting with Cass to discuss it. (Wachel Aff. ¶ 22).

50. Due to an emergency situation at another Airgas facility, Wachel had to reschedule the meeting. (Wachel Aff. ¶ 22).

51. Cass resigned from employment with Airgas on February 5, 2015. (Cass Dep, Exh. 18; Wachel Aff. ¶ 24).

52. During his employment with Airgas, Cass was a member of the Teamsters. (Cass Dep. at p. 35).

53. Cass never filed a grievance concerning any of the allegations that form the basis of this lawsuit. (Cass Dep. at p. 109).

54. When Cass returned from his leave of absence in 2014, there were no changes to his job duties. (Cass Dep. at p. 85; Wachel Aff. ¶ 15; Leith Aff. ¶ 12).

55. Cass was paid while he was on his leave of absence. (Wachel Aff. ¶ 14).

56. A few of Cass's colleagues teased him about possibly falling asleep on the job, but those comments were "intended jokingly." (Cass Dep. at pp. 156-57).

57. Cass did not find these comments to be demeaning. (Cass Dep. at p. 156).

58. Over the years, Cass frequently requested that he be excused from driving the forklift because it took him away from his duties in the laboratory. (Cass Dep. at pp. 125-26).

59. Cass's job description states that he "[m]ust be able to safely drive a forklift." (Cass Dep., Exh. 3).

60. Cass never told Kachur, Leith, or Wachel that he thought he was being discriminated against by Airgas. (Cass Dep. at pp. 161-162; Wachel Aff. ¶ 25; Leith Aff. ¶ 18).

61. Kachur, Leith, and Wachel were unaware of <u>any</u> complaints by Cass about alleged disability discrimination or harassment. (Wachel Aff. ¶ 25; Leith Aff. ¶ 18).

62. Cass has never spoken with Kachur. (Cass Dep. at p. 161).

63. Cass filed his charge of discrimination with the New Hampshire Commission for Human Rights in January of 2015. (Cass Dep., Exh. 23).

64. Leith and Wachel did not become aware that Cass had filed his charge of discrimination with the New Hampshire Commission for Human Rights until after Cass had submitted his resignation. (Wachel Aff. ¶ 26; Leith Aff. ¶ 19).

65. Cass never informed Kachur, Leith, or Wachel that he was concerned about safety issues at the Salem facility. (Cass Dep. at pp. 160-162; Wachel Aff. ¶ 27; Leith Aff. ¶ 20).

66. Leith and Wachel did not become aware that Cass had made any safety complaints until after Cass had submitted his resignation. (Wachel Aff. ¶ 27; Leith Aff. ¶ 20).

67. The gases contained in the cylinders Cass was responsible for analyzing are under high pressure and would pose a significant danger if released inappropriately due to damage to the cylinder. (Leith Aff. ¶ 7; Wachel Aff. ¶ 9).

68. If a seal on a cylinder broke, the release of pressure could effectively turn the cylinder into a missile. (Leith Aff. ¶ 7; Wachel Aff. ¶ 9).

69. After Cass returned from his leave of absence in 2014, he did not ask Leith or Wachel if he could be excused from driving the forklift because of his sleep apnea. (Wachel Aff. ¶ 29; Leith Aff. ¶ 22).

Respectfully submitted,

**AIRGAS USA, LLC**

By its attorneys,

/s/ Christopher B. Kaczmarek
Christopher B. Kaczmarek (Bar No. 17890)
Francis J. Bingham (Bar No. 269103)
LITTLER MENDELSON, P.C.
One International Place, Suite 2700
Boston, MA 02110
(617) 378-6000 (t)
(617) 737-0052 (f)
ckaczmarek@littler.com
fbingham@littler.com

Dated: May 15, 2018

**CERTIFICATE OF SERVICE**

I hereby certify that on this 15th day of May 2018, the foregoing document was filed electronically via the CM/ECF system and will be sent electronically to the registered participants and via first class mail to the non-registered participants as identified on the Notice of Electronic Filing.

/s/ Christopher B. Kaczmarek
Christopher B. Kaczmarek

Firmwide:154661580.1 071070.1012