UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

David F. Cass

    v.                           Civil No. 17-cv-313-JD
                                          Opinion No. 2018 DNH 157

Airgas USA, LLC

O R D E R

David F. Cass brings suit against his former employer, Airgas USA, LLC, alleging claims under state and federal law for discrimination because of his sleep apnea, retaliation against him for his complaints about discrimination, violation of the Whistleblower's Protection Act RSA chapter 275-E, and wrongful constructive discharge. Airgas has moved for summary judgment. Cass objects.

## Standard of Review

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact only exists if a reasonable factfinder, examining the evidence and drawing all reasonable inferences helpful to the party resisting summary judgment, could resolve the dispute in that party's favor." Town of Westport v. Monsanto Co., 877 F.3d 58, 64-65 (1st Cir. 2017) (internal quotation marks omitted); Flood v.

Bank of Am. Corp., 780 F.3d 1, 7 (1st Cir. 2015).  The facts and reasonable inferences are taken in the light most favorable to the nonmoving party.  McGunigle v. City of Quincy, 835 F.3d 192, 202 (1st Cir. 2016).

"On issues where the movant does not have the burden of proof at trial, the movant can succeed on summary judgment by showing 'that there is an absence of evidence to support the nonmoving party's case.'"  OneBeacon Am. Ins. Co. v. Commercial Union Assurance Co. of Canada, 684 F.3d 237, 241 (1st Cir. 2012) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). If the moving party provides evidence to show that the nonmoving party cannot prove a claim, the burden shifts to the nonmoving party to show that there is at least a genuine and material factual dispute that precludes summary judgment.  Woodward v. Emulex Corp., 714 F.3d 632, 637 (1st Cir. 2013).

Under the local rules in this district, a party moving for summary judgment must "incorporate a short and concise statement of material facts, supported by appropriate record citations, as to which the moving party contends there is no genuine issue to be tried."  LR 56.1(a).  A party opposing the motion must also incorporate a statement of material facts with appropriate record citations to show that a genuine factual dispute exists. LR 56.1(b).  "All properly supported material facts set forth in

the moving party's factual statement may be deemed admitted unless properly opposed by the adverse party." Id.

Airgas did not incorporate its statement of material facts in its memorandum in support of summary judgment and instead filed a separate factual statement. Cass stated in a footnote in his objection to the motion for summary judgment that Airgas did not provide a factual statement in support of its motion and did not note the disputed facts, as required by LR 56.1.[1] Cass included a section in his memorandum titled "Statement of Facts," but identified the disputed facts in a chart, rather than in a narrative statement of facts. Cass also provided a response to Airgas's facts but did not provide record citations. In its reply, Airgas states that "Cass failed to comply with Local Rule 56.1(b) because he has not properly identified any facts contained in Airgas's Statement of Material Facts to which he objects." Doc. no. 20, at *1. Cass responded that Airgas had made no attempt to comply with LR 56.1.

Airgas erred in filing a separate factual statement, in support of its motion for summary judgment, which should have been incorporated into the memorandum. LR 56.1(a). In

_____

[1] The moving party is required to incorporate a factual statement with record citations to show the undisputed facts. Contrary to Cass's theory, there is no requirement in LR 56.1 that the moving party identify disputed facts. Identifying material disputed facts is the job of the nonmoving party.

addition, Airgas's memorandum is twenty-one pages, and the separate factual statement is ten pages, making the total length thirty-one pages. A memorandum in support of summary judgment is limited to twenty-five pages, and Airgas did not seek leave to file a memorandum in excess of that limit. LR 7.1(a)(3).

Although presented in an unusual format, Cass did identify disputed facts with citations to the record in the chart. Cass also provided a "Response to Defendant's Factual Background," which includes some record citations, but not all statements are properly supported. Additional facts that Cass provided only in the argument section of his memorandum are not properly presented under LR 56.1.

Therefore, neither Airgas nor Cass fully complied with the requirements of LR 56.1. The court could impose sanctions for failure to comply with LR 56.1 and require Airgas to refile the motion. LR 1.3. It is unfortunate that neither counsel took care to follow the local rules. Had they done so, they and the court would not be spending time and resources discussing the matter. To avoid unnecessary delay, the court will consider the papers as filed.

## Background

Airgas represents that its business is to supply "gases, and related equipment and supplies, to customers in a host of

industries."  Doc. 10-2, ¶ 1.  Cass was a Specialty Air Gas
Filler Analyst at Airgas's facility in Salem, New Hampshire, who
worked on the second shift from 2:00 p.m. to 11:00 p.m.  He had
worked for Airgas for about twenty-one years in total during two
different employment periods.  His job was to analyze gases,
liquids, and carbon dioxide, stored in metal cylinders, to
determine whether they met industry standards.

While employed at Airgas, Cass suffered from sleep apnea.
He fell asleep during safety meetings, and a manager or another
employee would often say as Cass walked into a meeting, "don't
fall asleep."  Cass states that the most recent time he fell
asleep during a meeting was February of 2014.

During the spring of 2014, Cass found a carbon dioxide
cylinder that was contaminated and noted a noxious odor.  He
quarantined the cylinder and brought it to the attention of his
manager, Tom Trobley.  Cass also reported a safety concern to
his manager about a large bulk oxygen tank located next to an
outdoor electrical panel that was covered by a tarp.  Cass
believed that arrangement was dangerous because water could get
into the panel which could then cause the tank to explode.  When
that situation was not changed, Cass discussed it during a
safety meeting.

Airgas represents that in July of 2014, a supervisor found
Cass sleeping at his desk in the laboratory.  Although Cass

disputes that the supervisor saw him asleep, he does not dispute
that he was drowsy and fell asleep while working.  Airgas's
Safety Program Manager, Dana Leith, the human resources
representative, Patty Wachel, and Cass's supervisor, Matt
Kachur, conferred about the incident because Airgas thought
Cass's work was "safety-sensitive."  Leith, Wachel, and Kachur
decided that Cass should undergo a "fitness-for-duty
examination."  Cass disputes that his job was "safety-
sensitive."

The plant manager, Jason Lattig, met with Cass.  Cass told
Lattig that he was feeling fatigued.  Cass had been evaluated
for sleep apnea in 2013 by Dr. George Neal at the New England
Sleep Center, Catholic Medical Center.  In addition, Cass's
primary care doctor, Dr. Stephen Michaud, had prescribed a CPAP
machine to treat his sleep apnea.  Cass told Lattig that he had
not been using the CPAP machine as frequently as Dr. Michaud
recommended.  Lattig told Cass that he would have to have a
fitness-for-duty evaluation.

On July 23, 2014, Cass was evaluated at Salem Occupational
& Acute Care.  The report stated that he could perform the
essential job functions as were listed on "the provided job
description."[2]  Doc. no. 10-6, at 196.  He returned to work after

_____

[2] The job description was not included with the report.

the evaluation.  The evaluation report recommended that Cass be re-evaluated after seeing a specialist for sleep apnea and obtaining a report about Cass's use of a CPAP machine.

In response to the recommendation, Cass made an appointment with Dr. Michaud about his sleep apnea and his fitness for work. Dr. Michaud provided a statement dated September 17, 2014, in which he said that his "only concern would be [Cass's] diagnosis of severe sleep apnea.  If this is inadequately treated, I would have concerns about daytime fatigue and his safe operation of a forklift."  Doc. 10-6, at 197.

Cass also saw Dr. Neal again on September 30, 2014.  Dr. Neal reported to Dr. Michaud that Cass used his CPAP machine an average of thirty minutes on only 65 days out of 365 days.  Dr. Neal noted that was not adequate use of the machine.  Cass asked Dr. Neal about driving a forklift, and Dr. Neal responded that he should not do that because of his drowsiness.  Dr. Neal also discussed the risks of drowsy driving with Cass.  He suggested a return visit in four to six weeks.

A forklift was used to transport the metal gas cylinders in and out of the laboratory where Cass worked.  The parties dispute whether operating a forklift was an essential part of Cass's job.  Cass states that although he did occasionally operate a forklift to move cylinders, he did it for convenience not as an essential part of his job.  He also states that his

supervisors did not want him to operate the forklift to move cylinders because it took him away from his work in the laboratory.  After the issue arose about fatigue and the evaluation for fitness for work, Cass did not operate forklifts.

Cass submits an affidavit from another Airgas employee, Scott Thorpe, who states that he was diagnosed with narcolepsy and sleep apnea more than ten years before Cass's fatigue issue arose.  Thorpe states that he can fall asleep instantly and that Airgas is aware of his diagnoses.  He further states that despite his diagnoses and several warnings for knocking over gas cylinders and mislabeling, Airgas allows him to operate forklifts and has never required him to undergo fitness-for-duty testing as was required of Cass.[3]

In October of 2014, a doctor evaluated Cass's fitness for duty on behalf of Concentra Medical Centers, Airgas's "third-party medical provider."  The doctor also reviewed Dr. Neal's report.  He found that Cass could not perform the essential functions of his work because of fatigue caused by sleep apnea, which could be helped with regular use of the CPAP machine.  Concentra scheduled a follow-up appointment in thirty days.

Wachel, Leith, and Kachur decided that Airgas should put Cass on a paid leave of absence from work for a month, from

---

[3] Thorpe did have testing done related to obtaining a "CDL license."

October 3, 2014, to November 6, 2014.  On November 3, Cass saw
another doctor from Concentra for the follow-up examination.
His CPAP machine record showed that he was using it for more
than four hours only 43% of the time.[4]  The doctor told Cass he
could return to work if his usage increased to 70%.

A week later, the record showed usage for 70% of the time,
and Concentra cleared Cass to return to work with a follow-up on
December 5.  Cass returned to work and resumed his duties.  At
the follow-up appointment, Cass's records showed good CPAP usage
and he was cleared to continue work.  Concentra's report
required monitoring Cass's CPAP usage for four additional
months.

Leith notified Cass that he would have to submit his CPAP
machine readings to Concentra for four more months.  After that,
however, Wachel, Kachur, and Leith decided that Concentra should
monitor Cass's CPAP machine usage for six months.  On January
14, 2015, Leith sent Cass a letter informing him that he was
cleared to work but was required to continue to send the
readings from his CPAP machine to Concentra for six months.

Cass and his wife expressed concern about the continued
reporting requirement for Cass's CPAP machine usage.  Wachel

---

[4] Cass explains in his affidavit that his CPAP machine usage
was recorded on a chip in the machine which he took to his
"sleep doctor's office" to get a printout to take to the
fitness-for-duty evaluations.

scheduled a meeting to discuss the matter but then rescheduled the meeting.  Cass states in his affidavit that he and his wife met with a Concentra supervisor at Concentra on January 26, 2015, who told them that "they only do what Airgas tells them to do."  Cass also understood that "they were not sure why Airgas started sending me for fit for duty testing to begin with."  Doc. 18-2, at 18.  Before meeting with Wachel, Cass resigned from his job on February 5, 2015.

Cass filed suit in state court on June 14, 2017.  Airgas removed the case to this court.  Cass brings the following claims:  Count I, Disability Discrimination/Hostile Work Environment under RSA chapter 354-A; Count II, Disability Discrimination/Hostile Work Environment under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101; Count III, Disability Discrimination/Failure to Accommodate under RSA chapter 354-A; Count IV, Disability Discrimination/Failure to Accommodate under the ADA; Count V, Retaliation under RSA chapter 354-A; Count VI, Retaliation under the ADA; Count VII, violation of the Whistleblower's Protection Act, RSA chapter 275-E; and Count VIII, Wrongful (Constructive) Discharge.  Airgas removed the case to this court.

Discussion

Airgas moves for summary judgment on the grounds that Cass cannot prove that he was constructively discharged or that he was subjected to a hostile work environment, that he never requested an accommodation for his sleep apnea, that he cannot show retaliatory animus, and that he cannot prove his claims for violation of the Whistleblower Protection Act or wrongful discharge. In response, Cass argues that material factual disputes preclude summary judgment and that he can prove his claims. Airgas filed a reply, and Cass filed a surreply.

A.  Adverse Employment Action

Airgas contends that Cass's claims in Counts I, II, V, VI, VII, and VIII depend on showing that he was constructively discharged and argues that Cass cannot make that showing. Airgas also contends that Cass cannot prove a hostile work environment. Cass objects.

In Count I, Cass alleges disability discrimination under RSA chapter 354-A, and in Count II he alleges the same discrimination under the ADA. In Count V he alleges retaliation in violation of RSA chapter 354-A, and in Count VI he alleges retaliation in violation of the ADA. "As both this court and the New Hampshire Supreme Court have recognized, claims under Section 354-A are construed in conformity with the ADA." Gage

v. Rymes Heating Oils, Inc., 2016 WL 843262, at *5, n.5 (D.N.H. Mar. 1, 2016) (citing cases); see also Posteraro v. RBS Citizens, N.A., 159 F. Supp. 3d 277, 288 (D.N.H. 2016).

To establish a claim of disability discrimination based on an adverse employment action under the ADA, a plaintiff must show that "(1) she was disabled within the meaning of the ADA, (2) she was qualified to perform the essential functions of her job, either with or without reasonable accommodations, and (3) her employer took adverse action against her because of her disability." Sanchez-Figueroa v. Banco Popular de P.R., 527 F.3d 209, 213 (1st Cir. 2008). To prove an ADA retaliation claim, a plaintiff must show that he engaged in conduct protected under the ADA, he was subject to an adverse employment action, and that there was a causal connection between the protected conduct and the adverse action. Sepulveda-Vargas v. Caribbean Restaurants, LLC, 888 F.3d 549, 555 (1st Cir. 2018). A hostile work environment and constructive discharge constitute adverse employment actions under the ADA. Id. at 556; Parker v. Accellent, Inc., 2014 WL 6071550, at *9 (D.N.H. Nov. 13, 2014); Pabon-Ramirez v. MMM Health Care, 2013 WL 1797041, at *7 (D.P.R. Apr. 29, 2013).

In Count VII, Cass alleges violation of New Hampshire's Whistleblower Protection Act, RSA chapter 275-E, stating that Airgas "harassed abused, intimidated, threatened, and otherwise

discriminated against [him] in the terms, conditions, location, and/or privileges of employment, and constructively discharged him because of his reporting (whistleblowing)."  Compl. Doc. 1, ¶ 74.  To prove a claim under RSA 275-E:2, a plaintiff must show that he suffered an employment action prohibited by the Act, such as discharge from employment.[5]  In Count VIII, Cass alleges a claim for wrongful constructive discharge under New Hampshire law.  The standard for a claim of constructive discharge is the same as the standard for constructive discharge in the context of disability discrimination and retaliation.  See Porter v. City of Manchester, 151 N.H. 30, 42 (2004); see also Gallagher v. Unitil Service Corp., 2015 WL 5521794, at *7 (D.N.H. Sept. 17, 2015).  Therefore, the constructive discharge element of the state law claims in Counts VII and VIII is addressed along with constructive discharge for purposes of the disability discrimination and retaliation claims.

a.  Constructive Discharge

"Constructive discharge typically refers to harassment so severe and oppressive that staying on the job while seeking redress—the rule save in exceptional cases—is intolerable." Gerald v. Univ. of P.R., 707 F.3d 7, 25 (1st Cir. 2013)

---

[5] Airgas does not dispute that constructive discharge is an employment action prohibited by RSA 275-E:2.

(internal quotation marks omitted).  "A successful constructive discharge claim requires 'working conditions so intolerable that a reasonable person would have felt compelled to resign.'"  Id. (quoting Penn. St. Police v. Suders, 542 U.S. 129, 147 (2004)); see also E.E.O.C. v. Kohl's Dept. Stores, Inc., 774 F.3d 127, 134 (1st Cir. 2014); Porter, 151 N.H. at 42 ("Constructive discharge occurs when an employer renders an employee's working conditions so difficult and intolerable that a reasonable person would feel forced to resign.").  Further, "[t]he standard to meet is an objective one, it cannot be triggered solely by an employee's subjective beliefs, no matter how sincerely held."  Gerald, 707 F.3d at 25 (internal quotation marks omitted).

Airgas argues that no reasonable person would find the fitness-for-duty requirements to be so severe and oppressive as to make Cass's job intolerable.  Airgas further argues that Cass's job was "safety sensitive," in addition to driving a forklift, so that Cass's fatigue and falling asleep justified Airgas's requirements.  Airgas contends that it took reasonable measures to address Cass's fatigue and that he was unreasonably sensitive to the requirements.  Airgas also contends that Cass cannot claim constructive discharge because he quit before meeting with Wachel to discuss his concerns.

Cass contends that he was forced to resign from his job, constructively discharged, because Airgas required him to

undergo fitness-for-duty evaluations, to use his CPAP machine, and to submit the record of his CPAP machine usage for review by Concentra. He further contends that Airgas's requirements were unnecessary because driving a forklift was not an essential part of his job and were imposed in violation of the ADA. Because he believed that Airgas's focus on his sleep apnea and fatigue was unnecessary, he felt that Airgas was harassing him by imposing the fitness-for-duty requirements. He found the requirements burdensome and was worried about keeping his job. Cass also asserts that the ADA prohibits employers from requiring employees to undergo involuntary medical examinations.

### i. Airgas's Requirements

The fitness-for-duty evaluations and monitoring requirements that Airgas required were not so oppressive and onerous as to be intolerable, leaving Cass the only option of resigning. While Cass apparently found them burdensome, the standard is objective. Cass's own doctors recommended that he use the CPAP machine regularly and expressed concern about his ability to work and even to drive if he did not use the machine properly. Therefore, Airgas's requirements, on their own, do not rise to the level of constructive discharge.

Citing 42 U.S.C. § 12112(d)(4), however, Cass argues that Airgas's requirements were illegal under the ADA, making the

requirements intolerable as a matter of law.[6]  Airgas does not
dispute Cass's theory that if the requirements violated the ADA
they would constitute constructive discharge for purposes of his
claims.  Instead, Airgas contends that the requirements did not
violate § 12112(d)(4).

Under the ADA, "[a] covered entity shall not require a
medical examination and shall not make inquiries of an employee
as to whether such employee is an individual with a disability
or as to the nature or severity of the disability, unless such
examination or inquiry is shown to be job-related and consistent
with business necessity."  42 U.S.C. § 12112(d)(4)(A).  On the
other hand, however, an employer may require an examination or
make inquiries about the nature and severity of a disability if
the "examination or inquiry is shown to be job-related and
consistent with business necessity."  Id.  Stated in other
terms, an employer "may make inquiries into the ability of an

_____

    [6] Cass did not bring a claim under § 12112(d)(4) that Airgas
violated the ADA by improperly requiring examinations.
Therefore, that claim is not considered here.  Cf. Kowitz v.
City of Portland, 2018 WL 3521394, at *9 (D. Or. July 20, 2018);
Glover v. Brown, 2018 WL 3241072, at *2 (E.D. Cal. July 2,
2018); Jackson v. Regal Beloit Am., Inc., 2018 WL 3078760, at *6
(E.D. Ken. June 21, 2018) (discussing claim under § 12112(d)(4)
that challenged an improper medical examination); Benjamin v.
Consolidated Edison Co. of N.Y., Inc., 2018 WL 1406620, at *1
(S.D.N.Y. Mar. 20, 2018).  Instead, Cass cites the statute only
to show that Airgas's requirements were sufficiently onerous to
support constructive discharge.

employee to perform job-related functions."  29 C.F.R.
§ 1630.14(c).

Although the First Circuit has not addressed the issue,
other circuit courts have interpreted job relatedness and
consistency with business necessity for purposes of
§ 12112(d)(4).  "Medical inquiries and examinations are job-
related and consistent with business necessity when an employer
has a reasonable belief, based on objective evidence, that an
employee's ability to perform an essential job function is
impaired or that an employee will present a threat to himself or
others because of a medical condition."  Painter v. Illinois
Dep't of Transportation, 715 Fed. Appx. 538, 541 (7th Cir. 2017)
(citing EEOC Enforcement Guidance: Disability-Related Inquiries
and Medical Examinations of Employees under the Americans with
Disabilities Act (ADA) (July 27, 2000),
https://www.eeoc.gov/policy/docs/guidance-inquiries.html#6; Pena
v. City of Flushing, 651 Fed. Appx. 415, 421-22 (6th Cir. 2016);
Brownfield v. City of Yakima, 612 F.3d 1140, 1146 (9th Cir.
2010); Thomas v. Corwin, 483 F.3d 516, 527 (8th Cir. 2007).  It
is the employer's burden to show that its requirements or
inquiries are job related and consistent with business
necessity.  Kowitz, 2018 WL 3521394, at *9.

As is noted above, the parties dispute whether driving a
forklift was an essential function of Cass's job.  They also

dispute whether Cass's job was safety sensitive.  Cass does not

dispute, however, that staying awake at work was an essential

function of his job.  Therefore, whether or not Cass was

required to drive a forklift and whether or not his job was

safety sensitive, he was required to stay awake in order to

work.  Contrary to that requirement, he had fallen asleep while

working in the laboratory and had fallen asleep during safety

meetings.  He also acknowledged that he was fatigued and drowsy

at work.[7]

Cass also does not dispute that he had already been

prescribed a CPAP machine to address his sleep apnea and

resulting fatigue.  He does not dispute that he was not using

the CPAP machine as prescribed or that his lack of use caused

him to be fatigued and drowsy at work.  Therefore, Airgas's

inquiries and requirements that Cass undergo fitness-for-duty

evaluations with the resulting recommendation about using his

CPAP machine and monitoring his use were job-related and

consistent with business necessity.

---

[7] Cass attempts to minimize his drowsiness by arguing that
he had only fallen asleep once in the laboratory and by citing
Airgas's lack of attention to Scott Thorpe's sleep apnea and
narcolepsy diagnoses.  While additional episodes of falling
asleep would certainly be even more concerning, Cass did fall
asleep during work on several occasions-once in the laboratory
when his manager found him asleep and other times during safety
training meetings.  No more is necessary to raise the legitimate
concerns of Airgas about his fitness to work.  Cass provides no
evidence that Airgas had found Thorpe asleep at work.

ii. Premature Decision to Resign

The constructive discharge element of Cass's claims fails for an additional reason. An employee cannot show constructive discharge if he "assume[d] the worst" rather than accepting an opportunity to talk with the employer. Kohl's, 774 F.3d at 134. Here, Wachel, Airgas's human resources representative, planned to meet with Cass and his wife to discuss their concerns about Airgas's requirements. Cass, however, resigned before the meeting occurred. Therefore, Cass resigned prematurely, before attempting to resolve the issues about his fatigue and Airgas's fitness-for-duty requirements.

b. Hostile Work Environment

Airgas also contends that Cass cannot show that he was subjected to a hostile work environment based on his disability. A hostile work environment theory requires "evidence that the discriminatory [or retaliatory] conduct was sufficiently severe or pervasive so as to alter the conditions of employment and create an abusive work environment." Murray v. Warren Pumps, LLC, 821 F.3d 77, 86 (1st Cir. 2016); Noviello v. City of Boston, 398 F.3d 76, 90 (1st Cir. 2005). To constitute an adverse employment action, the harassment must be both "objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in

fact did perceive to be so." [Faragher v. City of Boca Raton,](#) [524 U.S. 775, 788 (1998).](#)

Although Cass found Airgas's requirements for evaluation and monitoring to be burdensome and he worried about whether he would keep his job, he has not shown that objectively those requirements were sufficiently severe or pervasive so as to alter his employment. Cass provides no evidence that he was subjected to any harassment at work about his sleep apnea. While he objects to the medical monitoring related to his fitness for his job, as is discussed above in the context of constructive discharge, he has not shown that he was subjected to intolerable conditions.

c. Outcome

Cass has not shown a triable issue as to whether he was constructively discharged or subjected to a hostile work environment. As a result, he cannot prove an element of his claims alleged in Counts I, II, V, VI, and VIII.[8] Count VII is addressed separately below because RSA 275-E:2 lists other

---

[8] In his objection to the motion for summary judgment, Cass mentions that he believes he was not sufficiently compensated during the leave of absence. Airgas asserts that it was a paid leave of absence. To the extent Cass now raises compensation during the leave of absence as an adverse employment action, he failed to allege that theory in his complaint and cannot amend the complaint through arguments made in his objection to summary judgment. See [Carson v. Ocwen Loan Servicing LLC,](#) [2017 WL](#) [1183960, at *9, n.99 (D. Me. Mar. 29, 2017).](#)

prohibited acts in addition to discharge.  Airgas is entitled to
summary judgment on Counts I, II, V, VI, and VIII.

B.   Accommodation

In Counts III and IV, Cass alleges that Airgas violated the
ADA and RSA chapter 354-A by failing to provide a reasonable
accommodation for his limitation of not being able to operate a
forklift.  An employer is required to make reasonable
accommodation for the known physical or mental limitations of a
qualified individual with a disability.  § 12112(b)(5)(A); RSA
354-A:7, VII(a).  "An employee must explicitly request an
accommodation, unless the employer otherwise knew one was
needed."  Jones v. Nationwide Life Ins. Co., 696 F.3d 78, 89
(1st Cir. 2012).

Airgas contends that Cass cannot show that he requested an
accommodation for his disability related to operating a forklift
because he had previously asked to be excused from operating a
forklift for other reasons.  Airgas also asserts that the
medical reports after Cass's leave of absence cleared him to
drive a forklift so that no accommodation was needed.  Further,
Airgas argues that operating a forklift was an essential job
function so that it was not required to excuse him from that
obligation.

Cass responds that operating a forklift was not an essential function of his job.  He also contends that because Airgas initially accommodated him by removing the forklift operation requirement, it was aware that he needed accommodation.  Cass also disputes that he previously requested to be excused from operating forklifts.

Under the circumstances, where Airgas provided coverage for forklift operation after Cass's sleep apnea became an issue, the record shows that Airgas knew of a need for accommodation at that time.  In addition, the medical evidence shows that Cass would not be cleared to operate a forklift, due to sleep apnea, if he did not use the CPAP machine as recommended.  Airgas continued to require monitoring to determine whether Cass was using his CPAP machine properly to avoid fatigue at work.

Based on the record presented, it is unclear whether operating a forklift was an essential function of Cass's job.  The job description that Airgas cites in support does not list operating a forklift in the section under "Essential Job Functions."  Instead, in the section titled "Physical Demands," the document states:  "Must be able to safely drive a forklift." Doc. 10-6, at 184.  Without further explanation, it is unclear whether that was essential or not, particularly in light of Cass's testimony that he operated a forklift only as a convenience.

Therefore, material factual disputes preclude summary judgment on Counts III and IV.

C.  Whistleblowers' Protection Act, RSA Chapter 275-E, Count VII

Under the Whistleblowers' Protection Act, "[n]o employer shall harass, abuse, intimidate, discharge, threaten, or otherwise discriminate against any employee regarding compensation, terms, conditions, location, or privileges of employment because (a) The employee, in good faith, reports . . . what the employee has reasonable cause to believe is a violation of any law or rule adopted under the laws of this state." RSA 275-E:2, I(a).  Cass contends that Airgas required the fit-for-duty evaluations and CPAP usage and monitoring to punish him for reporting safety concerns about the contaminated gas cylinder and the exposed electrical panel next to a bulk oxygen tank.  Airgas moves for summary judgment on the grounds that Cass cannot prove constructive discharge or retaliatory animus.

To prove a claim under RSA 275-E:2, I(a), a plaintiff must show that he engaged in protected conduct, that he suffered an action listed in the statute, and that there was a causal connection between his protected conduct and the employer's action.  Cluff-Landry v. Roman Catholic Bishop of Manchester, 169 N.H. 670, 674 (2017).  The New Hampshire Supreme Court

23

relies on federal case law interpreting retaliation claims under Title VII and employs the McDonnell-Douglas burden-shifting analysis in deciding claims under RSA chapter 275-E.  Appeal of Seacoast Fire Equip. Co., 146 N.H. 605, 608 (2001).  Under that analysis, the plaintiff must make a prima facie case of unlawful conduct, which shifts the burden to the employer to articulate a legitimate reason for the challenged actions, and then the plaintiff must rebut the reason given by showing that it is a pretext.  Id.

Although Cass lacks evidence of constructive discharge and a hostile work environment, RSA 275-E:2, I(a) lists other prohibited actions.  Cass alleges that Airgas "harassed, abused, intimidated, threatened, and otherwise discriminated" against him because of his safety reports, apparently referring to the fit-for-duty evaluations and CPAP machine requirements.  Airgas cites no authority to show that the harm alleged must rise to the level of constructive discharge or a hostile work environment.

Airgas also contends that Cass cannot show that its reasons for requiring evaluations and CPAP machine usage and monitoring were pretexts for retaliation against Cass for his reports.  In support, Airgas asserts that the decision makers, Wachel, Leith, and Kachur, did not know about his safety violation reports. While Wachel and Leith stated in their affidavits that they were

unaware of Cass's safety violation reports, Kachur did not provide an affidavit. Airgas did not submit other evidence that Kachur did not know of Cass's reports. Cass stated in his affidavit that he raised the safety issue about the electrical panel and the bulk oxygen tank at a plant safety meeting, which may have included Kachur. Because Leith was the plant safety program manager, a reasonable inference in Cass's favor could raise a dispute about whether he heard Cass's complaint at a safety meeting.

Therefore, Airgas has not shown that it is entitled to summary judgment on Cass's Whistleblowers' Protection Act claim, Count VII.

## Conclusion

For the foregoing reasons, the defendant's motion for summary judgment (document no. 10) is granted in part and denied in part. Summary judgment is granted in favor of the defendant on Counts I, II, V, VI, and VIII. The claims remaining are Counts III, IV, and VII.

Now that the claims in the case have been narrowed, the parties would be well-advised to engage in good faith discussions or mediation to determine whether the case might be resolved before the parties and the court expend the time and

resources necessary for a trial.  The court will require
mediation before trial.

    SO ORDERED

                                    _____
                                    Joseph A. DiClerico, Jr.
                                    United States District Judge


August 2, 2018

cc:  Francis J. Bingham, Esq.
     Leslie H. Johnson, Esq.
     Christopher B. Kaczmarek, Esq.